FILED

2016 Feb-11  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JACQUELYN THORNTON, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:14-cv-1995-JHH |
| BIRMINGHAM NURSING AND REHABILITATION CENTER EAST, LLC, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the December 22, 2015 Motion (Doc. #31) of Defendant Birmingham Nursing and Rehabilitation Center East, LLC (Birmingham East) for Summary Judgment. Pursuant to the court's December 28, 2015 order (Doc. # 34), the Motion (Doc. #31) for Summary Judgment was deemed submitted, without oral argument, on February 1, 2016. After careful review of the briefs and admissible evidence, the court concludes that the Motion (Doc. #31) for Summary Judgment is due to be granted in full for the following reasons.

### I. Procedural History

Plaintiff Jacquelyn Thornton commenced this action on October 17, 2014 by filing a complaint in this court alleging violations of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e et. seq and 42 U.S.C. § 1981 by Defendant Birmingham East.[1]   More specifically, Plaintiff contends that she was terminated because of her race.[2] Defendant's Motion (Doc. #31) for Summary judgment asserts that Plaintiff has failed to make a prima facie case of race discrimination and, in the alternative, Plaintiff has failed to rebut Defendant's legitimate and nondiscriminatory reason for her termination; therefore, Defendant argues that it is entitled to summary judgment.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence[3] (Doc. #33) in support of its own Motion for Summary Judgment and filed a supporting brief (Doc. #32) on December 22, 2015.  On January 21, 2016, Plaintiff filed a brief  (Doc. #35) in opposition to Defendant's Motion for Summary Judgment.  On February 1, 2016, Defendant filed a reply (Doc. #36) brief in support of its Motion for Summary Judgment.  All briefs and evidence have been considered by the court in making its determination on the Motion (Doc. #31) for Summary Judgment.

---

[1]  The original complaint also named Melody Burch as a Defendant, but the claims against her were dismissed by the court on January 30, 2015.  (See Doc. #16.)

[2]  The original complaint contained a number of other causes of actions, which were dismissed by the court on January 30, 2015.  (See Doc. #16.)

[3] Defendant submitted the following evidence in support of summary judgment: deposition of Jacquelyn Thornton, including exhibits; deposition of Melody Burch, including exhibits; declaration of Melody Burch, including exhibits; certified copy of Plaintiff's unemployment compensation appeals hearing.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.  The  method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with

4

positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[4]

### A.  Birmingham East Nursing and Rehabilitation Center East

Defendant Birmingham East is a long-term care nursing facility located in the Centerpoint area of Birmingham, Alabama. (Burch Aff. ¶ 3.) Birmingham East provides nursing and rehabilitative care to a diverse group of elderly and/or infirm residents. (Thornton Dep. at 41-42.)  Approximately 140 people are employed at Birmingham East, including 94 employees in the nursing department who provide care to residents on a daily basis. (Burch Aff. ¶ 4.)  The facility is divided into three units or wings -- the South Wing, North Wing, and Transitional Care Unit. (Id. ¶ 3.) At all relevant times, Melody Burch (Caucasian) was the facility's Executive Director, Sandy Copeland (Caucasian) was the Director of Nursing Services, and Leslie Watkins (Caucasian) was the Assistant Director of Nursing Services.  (Id. ¶¶ 1,2,10.)

As a long-term care nursing facility, Birmingham East is regulated by the Center for Medicare and Medicaid Services (CMS) and the Alabama Department of Public Health (ADPH).  (Id. ¶ 6.) To remain licensed and to properly protect the residents residing at its facility, Birmingham East must comply with specific

---

[4]   Facts are undisputed unless otherwise expressly noted.   If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

regulations promulgated by CMS and ADPH that mandate the process for promptly investigating and reporting allegations of resident abuse. (Id.) Accordingly, Birmingham East frequently trains all employees at orientation and throughout their employment on its policies and procedures for reporting allegations of resident abuse. (Burch Dep. at 19-23.).

**B.  Plaintiff's Employment at Birmingham East**

Plaintiff Jacquelyn Thornton (African American), a Licensed Practical Nurse, was hired by Birmingham East as an LPN Charge Nurse on May 31, 2012.  (Thornton Dep. at 49-50; Burch Aff. ¶ 7.)  Thornton primarily worked the 3:00 pm to 11:00 pm shift on the South Wing. (Thornton Dep. at 44-45.) She was responsible for providing nursing care to the facility's residents in accordance with Birmingham East's resident care policies and procedures, including Birmingham East's abuse reporting and prevention policies. (Id. at 46-47; Exh. 3 to Thornton Dep.)

**1.  Plaintiff's Training on Policies and Procedures**

During her employment, Thornton was trained on Birmingham East's policies and procedures regarding resident care and treatment, as well as abuse reporting and prevention. (Thornton Dep. at 53-58.) Thornton was trained at orientation on Birmingham East's Abuse Prevention Policy, and she received a copy of the

7

Employee Handbook. (Id. at  52-54; Exhibit 5 to Thornton Dep.)  The Employee

Handbook explained that  Birmingham East employees must "immediately report all

alleged violations involving mistreatment, neglect,  or abuse . . . to the Executive

Director . . . in accordance with federal and state laws." (Exh. 4 to Thornton Dep.)

Additionally, the Abuse Prevention Policy mandated that the "Executive Director and

Director of Nursing Services must be promptly notified of suspected abuse or

incidents of abuse.   If such incidents occur or are discovered after hours, the

Executive Director and Director of Nursing Services must be called at home or must

be paged and informed of the incident." (Thornton Dep. at 55; Exh. 6 to Thornton

Dep.) Thornton acknowledged her receipt of these policies and her obligation to

comply with them. (Exh. 5 to Thornton Dep.)

Additionally, Birmingham East provided Thornton with continuing education

on the abuse reporting requirements throughout her employment via training sessions

called "in-services." (Burch Aff. ¶¶ 6-7.) Thornton attended in-services on Abuse

Prevention on January 30, 2013, and March 1, 2013, just three weeks prior to the

incident that is the basis of her lawsuit. (Id. ¶ 7; Thornton Dep. at 56-58;  Exhs. 7, 8

to Thornton Dep.) In her deposition, Thornton admitted that she was obligated to

immediately report an allegation of resident abuse and that failing to report abuse was

a terminable offense under Birmingham East's policies. (Thornton Dep. at 68, 110-

8

12.)

### 2.  The Events Leading to Thornton's Termination

On March 26, 2013, Plaintiff, LPN Charge Nurse Marcellina Nwosu (African-American), and Certified Nursing Assistant Zenobia Cox (African American) worked the 3:00 p.m. to 11:00 p.m. shift.  (Burch Aff. ¶ 10.)  Thornton and Nwosu were assigned different sides of the South Wing for the purpose of passing out medications, but they were both responsible for all patients on the South Wing. (Burch Dep. at 106-107; Thornton Dep. at 112.)  During the evening shift, Nwosu went into a female resident's room to administer her medication, but the resident refused to take it. (Burch Aff. ¶ 10(a).) Later that evening,  Nwosu and Cox returned to the resident's room to get her ready for a bath.  (Id.)  At this time, the resident reported to Nwosu and Cox that she had been raped by Unit Manager James Nyoro and Birmingham East's Medical Director, Dr. Chatterji.  (Id. ) Nwosu documented the allegation of abuse in a Nurse's Note, but she did not report the allegation to Burch or Copeland in accordance with the Abuse Prevention Policy.  (Id.)

Sometime later, but during the shift, Nwosu approached Thornton at the nurse's station and reported the resident's allegation of rape. (Id. ¶ 10 (b).)  Thornton stated that she did not believe that the resident had been raped and even laughed about the

9

allegation.[5]  (Id.; Exh. 9 to Thornton Dep.)   There is no evidence that she made an attempt to assess the resident to see if she had been injured. (See id.; see also Exh. 9 to Thornton Dep.)  Additionally, she did not call Burch in accordance with the Abuse Prevention Policy.[6]  (Thornton Dep. at 110.)

During shift change at 11:00 p.m.,  Nwosu and Thornton discussed the  rape allegation with the oncoming South Wing nurse, Elizabeth Whitney (Caucasian), when they gave the customary verbal report of the condition of all residents on South Wing.  (Burch Aff. ¶ 10(d).)  Whitney conducted a physical assessment of the resident to look for signs of abuse.  (Id. ¶ 11(c).) Whitney did not call Burch or Copeland upon learning of the rape allegation at the shift change.  (Id. ¶ 10(d).)

On the morning of March 27, 2013, Sharon Camp, South Wing day shift LPN, arrived at the facility and read the Nurse's  Note, written by Nwosu, stating that a female resident had reported to Nwosu that the resident had been raped by South Wing Unit Manager James Nyoro,  Medical Director Chatterji and CNA Cox.[7]

---

[5] Thornton's written statement says: "When I was told I said 'really, is that was she said' that I giggled and said really.  I laugh and smile a lot, that is my personality[.] I did not mean any harm."  (Exh. 9 to Thornton Dep.)

[6] Thornton testified that she did not remember that night that the Abuse Prevention Policy mandated that she report any allegations of abuse to Burch and Copeland immediately, including calling her at home if the alleged abuse was discovered after hours.  (Thornton Dep. at 110; Exh. 6 to Thornton Dep.)

[7] Although not pointed out by the parties, the court is perplexed that the Nurse's Note would include CNA Cox as an alleged abuser, when the rest of the evidence establishes that the

(Burch Dep. at 95-96, 99; Burch Aff. ¶ 8.)  Camp immediately reported the contents of the Nurse's Note to Burch.  (Id.) In accordance with Birmingham East policies, Burch immediately began an investigation into the allegation. (Id. at 96.)  Burch directed nurses to first speak with and perform a body audit on the resident to check for bruising, redness, or signs of sexual abuse. (Id. at 97.)  Further, Birmingham East sent the resident to the emergency room to screen for signs of sexual abuse, Burch notified law enforcement, and Burch directed staff to interview other residents about their knowledge of any other incidents of sexual abuse.  (Id. at 97-98.) Upon learning the names of the alleged abusers, Burch suspended  Nyoro and Cox and told Dr. Chatterji he was not to return to Birmingham East until the investigation was completed.  (Id. at 96-98.)

Burch and the Assistant Director of Nursing, Leslie Watkins, met with Thornton on March 27, 2013 as part of the investigation of the rape allegation. (Burch Aff. ¶ 10(b).) During the interview, Thornton admitted she was made aware of the rape allegation during her shift the previous night. (Id.)  Burch asked Thornton why she did not report the resident's rape allegation in accordance with the Abuse Prevention Policy.  (Id.)  Thornton stated she did not believe it happened and admitted to laughing about the rape allegation when Nwosu reported it to her. (Id.;

---

alleged abuse was reported to CNA Cox, not that she was accused of the alleged abuse.

Thornton Dep. at 69.)  Thornton also provided a written statement describing her version of the night in question. (Thornton Dep. at 74-75; Exh. 9 to Thornton Dep.) In her written statement as in her verbal interview, Thornton admitted receiving the report from Nwosu at the nurse's station and laughing about the resident's rape allegation. (Id.)  Thornton apologized in her written statement for not calling Burch. (Exh. 9 to Thornton Dep.)  Burch noted that during the interview, Thornton "smirked during her recollection of the events, as if she found the resident's rape allegation funny.  She also did not seem . . . to understand the seriousness of the matter." (Burch Aff. ¶ 10(b).)

Burch also interviewed Nwosu, Cox and Whitney as part of her investigation. Their versions of events match the details above.  (See id. at ¶¶ 10 (a),(c) & (d).) Cox denied raping the resident.  (Id. ¶ 10(c).)  During Whitney's interview, she was tearful and apologized for not reporting the resident's allegations in accordance with the Abuse Prevention Policy.  (Id. ¶ 10(d).)

As a result of the investigation, Burch suspended Thornton, Nwosu and Whitney (Cox was already suspended) for failing to report the resident's allegation of rape in accordance with the Abuse Prevention Policy.  (Burch Dep. at 99-100; Burch Aff. ¶ 11; Exh. 6 to Thornton Dep.)  Burch then met with  Watkins to discuss the rape investigation and the suspended employees Thornton, Nwosu, Whitney, and

12

Cox.  (Burch Dep. at 103; Burch Aff. ¶ 11.)   Burch and Watkins concluded that Nwosu was the most culpable because the resident made the allegation to Nwosu during her shift, and she failed to immediately report the allegation (Burch Aff. ¶ 11(a); Burch Dep. at 105.)   They concluded that Thornton was also more culpable than the other two employees because Thornton was on the shift when the rape allegation was made, and she similarly failed to report it and did not conduct a physical assessment of the resident.   (Burch Aff. ¶11(b); Burch Dep. at 103.) Thornton also laughed and giggled about the allegation, showed no remorse for failing to report the rape allegation, and showed  no remorse or compassion for the resident.  (Burch Dep. at 103-104, 112; Burch Aff. ¶ 11(b).)

On the other hand, Burch and Watkins determined Cox and Whitney were less culpable.  (Burch Aff. ¶11(c) &(d).)  Although the resident made the allegation to Cox at the same time as Nwosu, Nwosu told Cox she would properly report the allegation and Cox relied on Nwosu's statement.  (Id. ¶ 11(c).)  Whitney was not on shift when the allegation was reported.  (Id. ¶ 10(d).)  After learning of the allegation, Whitney conducted a physical assessment of the resident to see if there were any physical injuries.  (Id.)  Additionally, when Burch interviewed Whitney about the incident, Whitney was tearful and remorseful about her failure to call and report the allegation and understood the seriousness of that failure.  (Id.)

13

Based on these findings and conclusions, Burch terminated Nwosu and Thornton for failing to immediately report the rape allegation as required by the Abuse Prevention Policy. (Id. ¶ 12; Burch Dep. at 103-104, 112.) Cox and Whitney were not terminated, but received a final warning. (Id.)

## C.  The Aftermath

Thornton applied for unemployment compensation benefits following her termination of employment with Birmingham East. (Thornton Dep. at 200). The Alabama Department of Labor initially disqualified Thornton from receiving unemployment compensation benefits on the basis of misconduct, but  appealed on the grounds that she was wrongfully terminated because of discrimination. (Thornton Dep. at 201-03; Exh. 20 to Thornton Dep).  Following a telephone hearing, the Hearing Officer ruled  against Thornton, finding Birmingham East terminated Thornton for violation of a previously known company policy. (Exh. 23 to Thornton Dep.)  Thornton appealed the decision, which was disallowed by the State Board of Appeals.  (Exh. 25 to Thornton Dep.)  Thornton did not appeal to the Circuit Court. (Thornton Dep. at 213.)

On April 5, 2013, Thornton filed an EEOC Charge, alleging she was discharged from Birmingham East on the basis of her race. (Exh. A to Doc. #1.) The EEOC issued a Right to Sue notice on July 28, 2014.  (Exh. B to Doc. #1.)  Thornton

filed the instant Complaint against Birmingham East on October 16, 2014. (Doc. #1.) Pursuant to her February 20, 2015 Amended Complaint,[8] the only remaining claim in this lawsuit is Thornton's allegation that she was discharged on the basis of her race in violation of Title VII and Section 1981.  (Doc. #16.)

## IV. Applicable Substantive Law and Analysis

Plaintiff contends that she was terminated on the basis of her race, and she brings her claims of race discrimination under both Title VII and Section 1981. Claims of race discrimination under section 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

## A.  Framework of Analysis

A plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence,

---

[8]  On January 30, 2015, the court granted in part and denied in part Birmingham East's Motion to Dismiss and Amended Motion to Dismiss, finding Thornton's claims under Title VII were limited to discriminatory discharge. (Doc. #16, at 14-16.)  Additionally, the court found that Thornton's allegations under Section 1981 were insufficient to meet the Twombly/Iqbal standard and requiring Thornton to file an Amended Complaint re-stating the allegations under Section 1981. (Id. at 16-18.)   Pursuant to the court's order, Thornton filed an Amended Complaint alleging Race Discrimination under Title VII and Section 1981 on the basis of her discharge. Thornton confirmed during her deposition her claims are limited to racially discriminatory discharge. (Thornton Dep. at 113.)

or statistics.[9]  See Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).   Here, Plaintiff presents only circumstantial evidence of racial discrimination.   "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified

---

[9]  See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

16

member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[10]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[11]  Where the defendant articulates multiple, reasonable,

[10]  See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[11]  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that

17

legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in

reason is not sufficient.  Chapman, 229 F.3d at 1030.

evaluating a Rule 50 motion); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## B. Plaintiff's Termination Claim

The parties hotly contest whether Plaintiff established a prima facie case. (See Doc. #32 at 13-16; Doc. # 35 at 5-9; Doc. # 36 at 2-7.) As the burden is admittedly a light one and can be established by many different methods, the court will assume without deciding that Plaintiff has established a prima facie case and get right to the heart of the matter.

Birmingham East articulated a legitimate, nondiscriminatory reason for terminating Plaintiff. Birmingham East terminated Thornton because she failed to report a resident's allegation of rape in violation of Birmingham East's Abuse Prevention Policy. Courts have consistently held that violations of company policies is a legitimate, nondiscriminatory reason. See, e.g. Usery v. Liberty Reg'l Med. Ctr., Inc., 560 Fed. Appx. 883, 888 (11th Cir. 2014). Because Birmingham East satisfied its burden of articulation, the presumption of discrimination falls and the burden of production now shifts to Plaintiff to offer evidence sufficient for a reasonable jury to

19

conclude that Birmingham East's legitimate reason is merely a pretext for illegal discrimination. See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000); see also Reeves, 530 U.S. at 147-48; Chapman, 229 F.3d at 1030.

As discussed above, pretext is established when a plaintiff "present[s] concrete evidence in the form of specific facts" showing that the defendant's proffered reason was pretextual. Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009). "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir.2005) (quotation marks omitted); see also Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."). A plaintiff does not demonstrate pretext by showing that the defendant had a mistaken belief about the facts that formed the basis for the alleged nondiscriminatory reason. Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265 (11th Cir. 2002). Instead, the plaintiff must present evidence that the defendant did not honestly believe the facts on which it based its nondiscriminatory reason. Id.

20

Further, when the employer provides a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." Chapman, 229 F.3d at 1030.  Conclusory allegations and assertions of discrimination are insufficient. See Bryant, 575 F.3d at 1308.

Plaintiff's pretext arguments are centered on the second theory of pretext- that race more than likely motivated the decision to terminate her.  Specifically, Thornton's focus is that Whitney, a similarly situated Caucasian employee, was treated more favorably than Thornton.[12]  (Doc. #35 at 5-8.)  The court rejects this argument for the reasons stated below.

Plaintiff contends that she was treated less favorably than Whitney, an alleged similarly situated employees outside her protected class.  Binding precedent from the Eleventh Circuit Court of Appeals requires Plaintiff's comparators to be similarly situated in all relevant respects to those comparators she identifies.  See, e.g., Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005); Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (reversing judgment in favor

---

[12]  Thornton also contends that Burch did not discuss Thornton's termination with anyone "with terminating power." (Doc. # 35 at 8.)  This argument is nonsensical.  First, Burch is the Executive Director of Birmingham East and is the highest ranking management employee onsite, with full authority to hire and fire employees.  (Burch Aff. ¶ 2.)  Thornton does not point to any policy, procedure, rule or regulation mandating that Burch consult with anyone before making an employment decision.  Even so, the evidence shows that Burch consulted with Watkins, the Assistant Director of Nursing in making the decision to terminate Thornton.  (Burch Dep. at 118; Burch Aff. ¶ 11.)

of plaintiff because employer entitled to judgment as a matter of law where plaintiff's comparator engaged in fewer instances of misconduct than plaintiff); <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (affirming summary judgment in employer's favor where alleged misconduct of comparators was not sufficiently similar to support disparate treatment claim); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1563 (11th Cir. 1997) (affirming summary judgment where plaintiff failed to produce sufficient evidence that non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged).  In evaluating the similarity of the comparators identified by the plaintiff, the most important variables in a discriminatory discipline case are the nature of the offenses committed and the nature of the punishments imposed. <u>See</u> <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1539 (11th Cir. 1989).  Both the "quantity and the quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples and oranges." <u>Maniccia</u>, 171 F.3d at 1368.  In this analysis, a court must keep in mind that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]" <u>Id.</u> at 1369. Moreover, the actions of the employer toward the proffered comparators are only relevant if the

22

decisionmaker knew of rule violations by the comparators and took no action against them.  Jones, 874 F.2d at 1542.

Plaintiff contends that Whitney, Caucasian, engaged in the same or similar conduct as Thornton, but that Whitney was not terminated.   Plaintiff argues that Burch chose not to terminate the Caucasian  employee and only terminated the African American employees who failed to report the alleged abuse.[13]  Because of this fact, Plaintiff concludes that she was discriminated against because of her race.  The court disagrees.

The resident in question made the rape allegation on Thornton's wing, during her shift, and while under the care of Thornton and Nwosu. (Burch Dep. at 106-08).  Thornton learned of the allegation during her shift while  she was  standing at the nurse's station.  (Burch Aff. ¶10(b).)  Thornton did nothing in response to the report of the allegation, other than "giggling."  (Exh. 9 to Thornton Dep.)  She did not conduct a physical assessment of the resident, and she did not report the allegation to Burch or anyone else in charge as required by the Abuse Prevention Policy.  (Id.; Burch Aff. ¶ 10(b).)  Additionally, during her interview with Burch, Burch noted that Thornton  smirked  about the resident's  rape allegation.  (Id.)  It was Burch's

---

[13] Plaintiff's argument ignores the fact that an African American, Cox, who also did not report the alleged abuse, was not terminated.

23

perception, based on Thornton's demeanor and attitude, that Thornton had no remorse for failing to report the rape allegation in accordance with company policy and had no remorse or compassion for the resident.  (Burch Dep. at 103-104, 112; Burch Aff. ¶ 11(b).)  Burch determined Thornton did not possess the level of compassion that a nurse at Birmingham East should possess.  (Id.)

In contrast, Whitney was not working or in the building when the allegation was made and only learned of the allegation in a verbal report at the beginning of her shift.  (Burch Dep. at 104.)  Whitney immediately conducted a physical assessment of the resident in accordance with the policy, but she did not report the allegation of abuse to Burch or anyone else.  (Burch Aff. ¶¶ 10(c) & 11(d).)  During her interview with Burch, Whitney was "tearful and remorseful" that she did not follow proper procedure and immediately notify Burch.  (Burch Dep. at 104.)  Burch believed that Whitney "understood the seriousness of her failure to report the abuse allegation." (Burch Aff. ¶ 11(d).)   Based on these differences, Burch decided to terminate Plaintiff's employment and retain Whitney, but give her a final warning.

That the decision to terminate Thornton was based on Thornton's subjective opinion does not aid Thornton in establishing pretext.  To show that the proffered reason for her termination was pretextual, Plaintiff must show that Defendant based the decision to discipline her on an unreasonable belief that she behaved in the

24

manner alleged.  See, e.g., Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 (11th Cir. 2001), cert. denied, 534 U.S. 976 (2001) (pretext means more than a mistake by the employer; actions taken based on a mistaken, non-discriminatory belief do not violate Title VII); Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000), cert. denied, 532 U.S. 958 (2001); Equal Employment Opportunity Comm'n v. Total Sys. Servs., Inc., 221 F.3d 1171 (11th Cir. 2000) (plaintiff could be properly discharged on defendant's good faith belief that she lied in an internal investigation); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000), reh'g denied, 218 F.3d 749 (11th Cir. 2000) ("a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991) (court's pretext inquiry is properly limited to whether the decision-makers believed the employee had engaged in conduct for which he was terminated and if so whether this belief was the reason for the discharge, not whether plaintiff was actually guilty of the conduct); Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1501 (11th Cir.1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge). Despite Plaintiff's conclusory assertion to the contrary, she has offered no evidence which contradicts the evidence before this court that Defendant terminated her because Burch believed that Thornton did not posses the level of caring and

25

compassion necessary to work at Birmingham East, while Whitney retained some of that confidence.  See Thomas v. Miami Veterans Med. Cntr., 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations insufficient to support pretext); Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

Simply, Plaintiff's pretext argument fails.  The record shows that Thornton violated the Abuse Prevention Policy, did not show any remorse for that failure and Burch believed she lacked compassion for the resident which resulted in Burch losing lost confidence in her ability to do the job , and accordingly terminated Plaintiff.  See Holifield, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.").  Plaintiff has not created a genuine issue of material fact as to whether Defendant's articulated reason for her termination was pretextual.  See Chapman, 229 F.3d at 1024-25. Defendant's motion for summary judgment is, therefore, due to be granted for the reasons articulated above.

**V.  Conclusion**

In summary, the court finds that no material issues of fact remain and that Defendant Birmingham Nursing and Rehabilitation Center East, LLC is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.  A separate order

will be entered.

**DONE** this the <u>  11th  </u> day of February, 2016.

_____

SENIOR UNITED STATES DISTRICT JUDGE